**G–69, a/k/a DG–2, and his wife, Plaintiffs,**

v.

**John DEGNAN, et al., Defendants.**

**Civ. A. No. 86–3282.**

United States District Court, D. New Jersey.

Aug. 21, 1990.

See also, 747 F.Supp. 1529.

Sprague, Higgins & Creamer by Pamela W. Higgins, Philip I. Weinberg, Collingswood, N.J., for plaintiffs.

Bernard F. Conway, Morristown, N.J., for "New Jersey Atty. Gen. Defendants:" John Degnan, Irwin I. Kimmelman, Barry Goas, David Brody, and Donald Belsole.

Archer & Greiner by George Kugler, Haddonfield, N.J., for "State Police defendants:" Clinton L. Pagano, Louis Taranto, Justin Dintino, Robert Winters, Joseph Guzzardo, Estate of William P. Sullivan, Joseph Calabrese, and John Bogdan.

## OPINION

BROTMAN, District Judge.

Presently pending is the motion of defendants John Degnan, Irwin Kimmelman, Donald Belsole, T. Barry Goas, and David V. Brody (the "Attorney General defendants") for summary judgment in this complex civil rights action. The state police defendants have not joined in these motions nor have they filed their own. Resolution of the instant motion revolves around the application of the law of the due process clause, as it exists in the aftermath of *DeShaney v. Winnebago County Department of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), to the state's decision to renege on its alleged agreement to provide for the relocation and new identity of a confidential informant after his undercover identity had been disclosed.

## I. FACTS AND PROCEDURE

Plaintiff G–69 [1] brought suit under 42 U.S.C. § 1983 for alleged due process violations arising out of the state's asserted failure to perform contractual obligations to provide for his safety and that of his wife. Defendants include John Degnan, formerly the Attorney General of New Jersey, Irwin Kimmelman, formerly the Attorney General of New Jersey, Donald Belsole, the Director of the Division of Criminal Justice, T. Barry Goas, Attorney in Charge of the Special Prosecution Branch, and David V. Brody, Deputy Attorney General with the Special Prosecutions Division. The complaint also names as defendants individual police officers and detectives who allegedly participated in the conduct which forms the basis for the civil rights claim.

The first count of the complaint alleges deprivations of property and liberty interests guaranteed by the due process clause of the fourteenth amendment and Art. I par. 1 of the New Jersey Constitution. The crux of G–69's claim is that the State of New Jersey, through defendants, entered into an agreement with him under which he would aid in the investigation of organized crime in return for a license to work in the casino industry, for money, and for promises concerning relocation and protection in the event that his undercover identity was discovered. Deposition of G–69 at 137–145, 149.

Plaintiffs further allege that defendants insured that plaintiff received only a temporary license to work in the casinos so that his future cooperation would be assured. Deposition of G–69 at 64, 73, 74, 75. Pursuant to an alleged subsequent oral agreement entered into in 1984, defendants made certain additional promises with regard to plaintiff's personal and financial security.

G–69's undercover role was compromised in May, 1984, when a person from his past [2] saw and recognized him. Plaintiffs were instructed to remain at their home and not

---

1. G–69 is a pseudonym used to protect plaintiff and his wife from possible threats against their lives and safety as explained more fully within.

2. G–69 had been given a new identity and relocated because of his role as a witness in a prior federal prosecution. It was only after he obtained a new job with a casino in New Jersey that he learned of the licensing procedure, which would require him to lie on the application for the license. It was when he approached New Jersey authorities to secure permission to place false information on his license application that he entered into the undercover agreement with the New Jersey authorities. The person who recognized G–69 knew him from his activities in the earlier federal prosecution. There is no claim here against federal authorities.

to leave it. Plaintiffs allege that they remained there as virtual prisoners over the next several months as defendants decided whether to honor their agreement with G–69. After some delays, defendants partially complied with the alleged oral agreement by making cash payments and placing plaintiff in a "safe" house in January, 1985. *E.g.* Deposition of G–69 at 150. The state officials discontinued all assistance to plaintiffs as of October 31, 1985.

A newspaper article published on April 23, 1986 [3] further destroyed the undercover status of G–69. The article described how he had supplied information to the New Jersey state police concerning a boxing fight at which Nicodemo Scarfo was to attend; the article disclosed how this information had been used to keep Governor Thomas Kean from exposing himself to a politically embarrassing situation. *See* Exhibit B to Complaint.

On this relatively modest factual foundation plaintiff has constructed a claim under 42 U.S.C. § 1983 for deprivations of a liberty and property interests in violation of the due process clause. In short, plaintiffs claim that the contract with the state afforded them property rights under *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and its progeny, and that the conduct of the state officials has deprived them of the liberty of interstate travel by creating a situation in which they are unable to travel throughout the states for fear for their lives. Plaintiffs also claim that the contract between G–69 and defendants created a "special relationship" such that the state had an affirmative duty, as a matter of constitutional law, to provide protection and relocation.

The complaint also includes claims under state law for breach of contract, fraudulent misrepresentation, invasion of privacy, and intentional and negligent infliction of emotional distress. Plaintiffs seek compensatory and punitive damages and a permanent injunction requiring defendants to perform their obligations under the contract, including the payment of money due plaintiffs.

Defendants raise five grounds for the entry of summary judgment: (1) the claims against the Attorney General defendants are "official capacity" claims which must be dismissed as a matter of law; (2) the Attorney General defendants are not "persons" within the meaning of 42 U.S.C. § 1983; (3) the Attorney General defendants are entitled to qualified or absolute immunity; (4) the conduct of the state police defendants cannot be imputed to the Attorney General defendants; [4] (5) the pendent claims should be dismissed for lack of jurisdiction.

## II. DISCUSSION

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Hersh v. Allen Prods. Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.,* 464 F.2d 870, 874 (3d Cir.1972). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Recent Supreme Court decisions mandate that "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which,

---

**3.** Plaintiffs filed the complaint on August 19, 1986.

**4.** In light of the court's disposition of the instant motion, it is unnecessary to address this argument.

when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring) (citing *Anderson*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Moreover, once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

The court will address first whether the moving defendants are persons within the meaning of Section 1983, as that issue goes to whether plaintiffs have stated a cause of action. Only if the complaint does state a claim is it necessary to evaluate defendant's affirmative defense of qualified immunity in light of the evidence presented as viewed in the light most favorable to plaintiffs.

### 1. Defendants as "Persons" Within the Meaning of Statute

Defendants rely on the recent Supreme Court case in *Will v. Michigan State Dep't of Police*, —— U.S. ——, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), for the proposition that they are not "persons" within the meaning of § 1983 because they acted in their official capacities. *Will* simply held that a former employee's claim against the Department of State Police, his employer, and the Director of the State Police in his official capacity was not a suit against a person within the meaning of § 1983. The Supreme Court reasoned that Congress in enacting § 1983 did not intend to abrogate common law immunities, *id.* 109 S.Ct. at 2309, and since a state official in his official capacity was entitled to immunity, *see* U.S. Const. amend. XI, any official entitled to

Eleventh Amendment immunity is not a person within the meaning of the statute.

Defendants claim that the suit seeks to impose monetary damages against them in their official capacities. They assert that they were acting solely on behalf of the state when they entered into the agreement with G–69. They also present portions of plaintiff's deposition in which he states that he sought to enter in a contract with state agencies, and that he just wanted the individuals to be named on the contract so that he would have someone who was responsible for dealing with him.

This court's March 2, 1987 opinion accurately described the jurisprudence of the Eleventh Amendment:

> There are two exceptions to the general *Edelman* [*v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)] ban on federal court suits directed at state officials. *Ex Parte Young* allows for an award of prospective injunctive relief against a state official. 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714] (1908). Fiscal consequences to the state treasury are allowed where they are ancillary costs associated with the prospective relief. *Hutto v. Finney*, 437 U.S. 678, 691 [98 S.Ct. 2565, 2573, 57 L.Ed.2d 522] (1978)....

> The second exception arises when a state officer is being sued for unconstitutional actions taken in an individual capacity. *Scheuer v. Rhodes*, 416 U.S. 232, 238 [94 S.Ct. 1683, 1687, 40 L.Ed.2d 90] (1973).

*G–69 v. New Jersey Division of Gaming Enforcement*, Civil No. 86–3282 D.N.J. Mar. 2, 1987) slip op. at 8. The Supreme Court recently reaffirmed this court's analysis of the prospective injunctive exception:

> Of course a State official in his or her official capacity, when sued for injunctive relief, would still be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State."

*Will*, 109 S.Ct. at 2311 n. 10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14,

105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)).

 In the instant case it is possible to separate the two types of claims against the Attorney General defendants. To the extent that plaintiffs seek prospective injunctive relief, the court may exercise jurisdiction over state officials in their official capacities. *Graham,* 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14.[5] The complaint also seeks compensatory damages, which is consistent with the Eleventh Amendment immunity when sought from officials in their individual capacities. *Scheuer,* 416 U.S. at 237–38, 94 S.Ct. at 1686–87. Accordingly, the Eleventh Amendment presents no jurisdictional bar to plaintiffs' claims for monetary damages from the Attorney General defendants in their individual capacities, and these defendants are "persons" within the meaning of Section 1983.

### 2. *Absolute Immunity*

 Although defendants assert that they were acting in a prosecutorial function, and are therefore entitled to absolute immunity under *Rose v. Bartle,* 871 F.2d 331, 343 (3d Cir.1989), the court concludes that defendants were acting solely in their investigatory capacities and are entitled only to qualified immunity.

In *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court held that prosecutors are absolutely immune from suit for "activities intimately associated with the judicial phase of the criminal process...." *Id.* at 430, 96 S.Ct. at 995. Adopting a functional approach, the Court held that the prosecutor, who was alleged to have knowingly used perjured testimony, was immune for conduct "in initiating a prosecution and in presenting the State's case...." *Id.* at 431, 96 S.Ct. at 995. *Imbler* left open, however, the issue whether a prosecutor was entitled to absolute, qualified, or no immunity for investigative acts.

Since *Imbler,* the Third Circuit has indicated that a prosecutor is entitled to only qualified immunity under § 1983 for investigative or administrative acts. *See Rose,* 871 F.2d at 343; *Ross v. Meagan,* 638 F.2d 646, 648 (3d Cir.1981); *Mancini v. Lester,* 630 F.2d 990, 992–94 (3d Cir.1980); *Forsyth v. Kleindienst,* 599 F.2d 1203, 1214–15 (3d Cir.1979), *cert. denied sub nomine Mitchell v. Forsyth,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). *Accord Mitchell v. Forsyth,* 472 U.S. 511, 520–24, 105 S.Ct. 2806, 2812–14, 86 L.Ed.2d 411 (1985). In the instant case, although the Attorney General defendants may have "acted within their official roles as officers of the Department of Law and Public Safety," Defendants' Reply Brief in Support of Motion for Summary Judgment at 10, it is clear that they were acting in their investigative capacities. Nothing in the record suggests that defendants were investigating G–69 with the intent to seek an indictment as to him, although they may have been using his information to indict others. The relationship is best characterized as investigative or administrative; the interactions between plaintiffs and defendants were such that defendants are entitled only to qualified immunity.

### 3. *Qualified Immunity*

With respect to qualified immunity, plaintiff must show that defendants violated some clearly established right. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The Supreme Court further refined *Harlow*'s clearly established law standard in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987):

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that

---

**5.** At present, the current Attorney General for the State of New Jersey is not named a defendant. The court is unable to substitute him as a party pursuant to Fed.R.Civ.P. 25(d)(2) because the original complaint did not name as a defendant the Attorney General in office when the complaint was filed.

Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.

*Id.* at 639, 107 S.Ct. at 3038. *See* Comment, *Anderson v. Creighton: Qualified Immunity—Is Good Faith All that Is Required?*, 10 Bridgeport L.Rev. 255, 265 (1989) (discussing *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). The Supreme Court in *Anderson* went on to explain:

> our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Id.* 483 U.S. at 640, 107 S.Ct. at 3039.

■ Defendants have submitted affidavits stating that they were aware of no constitutional or statutory basis suggesting that a violation of the contract with G–69 would be a constitutional violation. The affidavits are not determinative, or even helpful. Likewise, discovery into the subjective beliefs of the individual defendants, as requested by plaintiff's Rule 56(f) affidavit, *see Radich v. Goode*, 886 F.2d 1391, 1393–94 (3d Cir.1989); *Lunderstadt v. Colafella*, 885 F.2d 66, 71 (3d Cir.1989); *Dowling v. City of Philadelphia*, 855 F.2d 136, 139–40 (3d Cir.1988), is of no relevance to the availability of the immunity. Whether there was a clearly established right is a legal question to be determined on an objective basis; what the individual defendants subjectively believed is not relevant to this determination. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039 (a defendant's "subjective beliefs about the [allegedly unconstitutional conduct] are irrelevant");

*Harlow*, 457 U.S. at 817–18, 102 S.Ct. at 2737–38.[6]

Plaintiffs must show that G–69's property and liberty interests under the due process clause were clearly established as of October 31, 1985, the date when defendants discontinued all assistance to plaintiffs.

Plaintiffs assert deprivations of property and liberty interests, as well as a violation of a duty imposed by the state's affirmative conduct which created a special relationship between plaintiffs and the state. Although these claims are closely related, they are analytically distinct. Plaintiffs' property deprivation claims can be considered a claim that the agreement with the state created an employment contract that was terminated without pretermination notice and an opportunity to be heard. Likewise, the liberty deprivation can be construed as a claim that the state has directly interfered with plaintiffs' right to interstate travel. Plaintiffs' final constitutional claim is that the state violated a constitutionally imposed duty when it failed to provide protection, relocation, and a new identity. Plaintiffs argue that the state had such a duty because its affirmative conduct in inducing G–69's cooperation as an undercover informant with such promises in the event of the loss of his undercover identity created a special relationship. Put alternatively, the conduct of the state placed plaintiffs in what they consider to be *de facto* custody, that is, an existence in which they feel they are unable to appear in public for fear of threats to their safety.

While the first claim is an attempt to recharacterize the conduct at issue to fit into the confines of an established constitutional doctrines, and the second claim focuses on the actions of private parties for whom the state is not responsible, the final

---

**6.** Although the Third Circuit has, in one case, noted that the defendant has the burden of establishing immunity, *Ryan v. Burlington County*, 860 F.2d 1199, 1204 n. 9 (3d Cir.1988), *cert. denied sub nomine Fauver v. Ryan*, —— U.S. ——, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), the immunity determination is a question of law and not a factual issue for the jury to determine. Even though the defendant has the burden of showing that there are no *facts* that preclude entry of summary judgment, *Powell v. Miku-*

*lecky*, 891 F.2d 1454, 1457 (10th Cir.1989), and to such an extent the defendant does have the burden of establishing the defense, once the facts have been established, neither party has a burden of persuasion as to the legal question concerning the availability of the immunity defense. *See The Qualified Immunity Doctrine in the Supreme Court: Judicial Activism and the Restriction of Constitutional Rights*, 138 U.Pa.L. Rev. 23, 72–73 & n. 280 (1989).

claim most properly addresses the critical issue: whether the state's affirmative conduct imposes on the state a constitutional duty to aid G–69 and his wife.

### (a) Property Interest

■ The Supreme Court defined "property" as protected by the due process clause in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), as follows:

> To have a property interest in a benefit, a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must instead have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709. The Supreme Court further stated in a companion case:

> We have made clear in *Roth* ... that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (citations omitted). The inquiry is twofold: first, the court must determine whether the interest asserted by plaintiffs is a substantive interest protected by the due process clause, and second, if the interest was protected, what process was due. *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985); *Richardson v. Felix*, 856 F.2d 505, 507 (3d Cir.1988).

■ In the instant case, plaintiffs characterize the contractual relationship between G–69 and defendants as an employment relationship. They stress that defendants made clear to G–69 that his license would continue to be renewed only if he continued to cooperate with the state authorities. *See* Deposition of G–69 at 773–76. Plaintiffs argue that the defendants were able effectively to condition G–69's employment on his cooperation with the State, and therefore his relationship with the State was an employment relationship. Plaintiffs further argue that there was no grievance procedure available under the agreement. Most persuasive is their claim that the due process clause required a pretermination hearing because of the significance of G–69's interest in his safety and in his ability to obtain work (he must have an identity to obtain employment) in relation to the minimal burden that would have been imposed by a pretermination hearing. *See Loudermill*, 470 U.S. at 543, 105 S.Ct. at 1494; *Stana v. School Dist. of City of Pittsburgh*, 775 F.2d 122, 127 (3d Cir.1985) (citing *Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

Although the deposition of G–69 is sufficient to establish, for purposes of this motion, that the contractual relationship was such that G–69 had a clearly established right to the protections of the due process clause under *Harlow*, plaintiffs are unable to show that reasonable officials would have believed defendants' conduct was unconstitutional. *Anderson*, 483 U.S. at 640, 641, 107 S.Ct. at 3039, 3039. The immunity inquiry necessarily draws attention away from plaintiffs' perceptions of the relationship, and instead focuses on what an objectively reasonable official would believe. In this regard, it is noteworthy that none of the parties have presented the court with a precedent with facts similar to the instant case. While plaintiffs may have perceived that the relationship was an employment relationship, it was objectively reasonable for defendants to have viewed it in a different light.

The relationship between G–69 and the Attorney General defendants was not a standard employment relationship, or even a conventional license from a conventional government authority; G–69 received the license from the New Jersey Casino Control Commission and not directly from defendants. *Cf. Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971); *Chalkboard, Inc. v. Brandt*, 879 F.2d 668 (9th Cir.1989); *Venrod Corp. v.*

*Secretary of the Treasury of the Commonwealth of Puerto Rico,* 704 F.Supp. 21, 24 (D.P.R.1989); *Smith v. Commissioner of the Georgia Department of Public Safety,* 673 F.Supp. 446, 448 (M.D.Ga.1987). Moreover, defendants did not pay G–69; rather, it was the casino for which he worked that paid him. Although plaintiffs' safety interest and interest in obtaining identification were significant, defendants could have reasonably believed that their refusal to provide further assistance to G–69 without a pretermination hearing was constitutional because the state courts afford plaintiffs process sufficient to protect whatever property interest he might have had. *See Dobosz v. Walsh,* 892 F.2d 1135, 1141 (2d Cir.1989) (right to pre-suspension hearing not so clearly established that a reasonable official would have believed defendant's conduct was unconstitutional); *Powell v. Mikulecky,* 891 F.2d 1454, 1458–1462 (10th Cir.1989) (availability of extensive post-deprivation process rendered termination with minimal predeprivation process such that defendants could not reasonably have known their conduct was unconstitutional); *Balzano v. Township of North Bergen,* 649 F.Supp. 807 (D.N.J. 1986) (no due process violation where plaintiff not reimbursed for unused sick leave because adequate post-deprivation hearing provided by state courts). The complete lack of any analogous case requires this court to find that defendants' conduct was not so unreasonable in light of clearly established law as to vitiate their qualified immunity. Accordingly, defendants are entitled to summary judgment as to the claims for money damages arising out of alleged deprivations of property interests.

### (b) Liberty Interest

■ G–69 also claims that he has been denied a liberty interest in that defendants placed him in a position in which his life would be endangered to such an extent that G–69 would be forced to refrain from travelling in public. To the extent that it is predicated on the state's inducing plaintiff to be an informant, this claim fails. G–69 took the position in the casino of his own free will and voluntarily entered into an agreement to provide information to the state. In this sense, it was plaintiff's decision, and not anything that the state did, that presented the risk, realized here, that someone from his past would recognize him. *See Walker v. Rowe,* 791 F.2d 507 (7th Cir.), *cert. denied,* 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 597 (1986).[7] To this extent, plaintiffs cannot look to defendants for money damages, as they could reasonably have believed that their conduct did not deprive plaintiffs of their right to interstate travel.

Plaintiffs also seem to claim that defendants' failure to provide a new identity created a situation in which they are unable to travel because of threats to their safety provides another basis for recovery. To the extent that plaintiffs press such an argument, the court considers it in connection with the "special relationship" analysis.

### (c) Special Relationship

■ Plaintiffs argue on the basis of *De-Shaney v. Winnebago County Department of Social Servs.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), that defendants' actions in placing plaintiffs in a dangerous situation created a special relationship which carried with it a duty to

---

7. In *Walker,* the Seventh Circuit held that prison guards were not entitled to recover from the State for injuries and deaths that occurred in a prison riot. The Seventh Circuit rejected plaintiffs' claim that the State was responsible under the due process clause for the unsafe working environment:

> If a press gang had picked people up from the streets and forced them to bc guards at Pontiac, this line of cases would require the state not to be indifferent to the guards' working conditions. But the state did not draft its guards; they enlisted, on terms they found satisfactory, and they were free to quit whenever they pleased. The state must protect those it throws into snake pits, but the state need not guarantee that volunteer snake charmers will not be bitten. It may not throw Daniel into the lion's den, but if Daniel chooses to be a lion tamer in the state's circus, the state need not separate Daniel from his charges with an impenetrable shield.
>
> *Id.* at 511.

protect plaintiffs; they assert that defendants violated this duty.

In *DeShaney*, the Supreme Court held that social workers and public officials had not violated the due process clause by failing to take a child from his father when they had reason to believe that the child was a victim of child abuse. The Supreme Court reasoned that only when the state affirmatively restrains an individual's liberty such that the individual can no longer provide for his own needs does it affirmatively assume the duty to provide for such basic human needs. *Id.* 109 S.Ct. at 1005–06. Thus, the "affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 1006. Critical to the analysis in *DeShaney* was the fact that the state, although aware of the dangers faced by DeShaney, "had played no part in their creation nor did it do anything to render him more vulnerable to them." *Id.* at 1006.

The analysis in *DeShaney* is clearly relevant to plaintiffs' claims; they assert that defendants' refusal to honor the agreement placed them in a position in which they could not secure employment or medical treatment because they lacked proper identification. They further allege that this failure to act violated express assurances and contractual duties to provide such identification and safety. Had there not been such assurances, plaintiff would not have agreed to become an informant. In short, plaintiffs assert that the State's affirmative actions created the danger plaintiffs now face, and that the state's role in creating the danger imposes on it a duty to perform its obligations under the contract.

Insofar as plaintiffs' claims for money damages, *DeShaney* was decided only last year and does not, by itself, demonstrate that there existed a clearly established right, *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, such that a reasonable official would have known in 1985 that the conduct here at issue was unconstitutional. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. The

analysis in *DeShaney* was foreshadowed in *Estate of Bailey by Oare v. County of York*, 768 F.2d 503 (3d Cir.1985), a case in which the Third Circuit found there was a claim against county officials where a child died from child abuse as a result of a county agency's improper release of the child into a dangerous situation. The Third Circuit has since found, however, that *DeShaney* overruled the analysis of *Estate of Bailey*. *Philadelphia Police and Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156, 167 (3d Cir.1989).

Likewise, there is a line of cases involving a state's duty to persons placed in custody by the State. *Ryan v. Burlington County, New Jersey*, 860 F.2d 1199 (3d Cir.1988), *cert. denied sub nomine Fauver v. Ryan*, — U.S. —, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). Other cases had employed similar analyses in certain limited circumstances. *E.g., Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (no due process claim where negligence of prison officials resulted in one prisoner being beaten by another); *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980) (suggesting that parole board could be liable for acts of prisoner released on parole where sufficient relation between released prisoner's actions and parole decision); *Walker*, 791 F.2d at 510–511 (due process clause does not afford prison guards who choose line of employment the right to protection from prison riots); *McClary v. O'Hare*, 786 F.2d 83 (2d Cir.1986) (no due process claim where plaintiff died as a result of alleged state policy to disregard safety requirements for the operation of crane); *Beard v. O'Neal*, 728 F.2d 894, 899 (7th Cir.1984) (FBI informant had no constitutional duty to prevent murder where he accompanied murderer during crime); *White v. Rochford*, 592 F.2d 381, 384–85 (7th Cir.1979) (possible violation of due process clause where police arrested adult custodian of children and abandoned children in health-endangering circumstances). *See generally* Comment, *Actionable Inaction: Section 1983 Liability for Failure to Act*,

53 U.Chi.L.Rev. 1048, 1049–1057 (1986) (discussing case law as of 1986).

Although the Third Circuit has interpreted the standard set forth in *Anderson* as " 'requiring some but not precise factual correspondence [between precedents and the conduct at issue] and demanding that officials apply general, well developed legal principles,' " *Stoneking v. Bradford Area School Dist.*, 856 F.2d 594, 599 (3d Cir. 1988) (*Stoneking I*) (quoting *People of Three Mile Island v. Nuclear Regulatory Commissioners*, 747 F.2d 139, 144 (3d Cir. 1984)), *vacated on other grounds sub nomine Smith v. Stoneking*, — U.S. —, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), plaintiffs are unable to make such a showing. Plaintiffs have not presented any cases analogous to the facts present here.[8] Even if the *DeShaney* rationale were applied retroactively as to the issue of the clearly established law, the Supreme Court in *DeShaney* specifically declined "to consider whether the individual respondents might be entitled to a qualified immunity defense" under the standard enunciated in *Anderson v. Creighton. DeShaney*, 109 S.Ct. at 1007 n. 10. The lack of any precedent with a pattern of facts analogous to those presented in the instant case requires this court to hold that defendants are entitled to qualified immunity as a matter of law. Although the court's resolution of the prospective injunctive relief question forecloses the qualified immunity defense in similar cases from this date forward, the conduct at issue here occurred in 1985 and 1986, a period when defendants could reasonably have believed their conduct did not violate plaintiffs' constitutional rights. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

■ Resolution of the qualified immunity issue, however, does not require dismissal of the entire case because "[q]ualified immunity protects defendants from liability, not from injunctive relief." *Smith v. Coughlin*, 727 F.Supp. 834, 839 n. 8 (S.D.N.Y.1989). *See Brandon v. Holt*, 469 U.S. 464, 471–73, 105 S.Ct. 873, 877–78, 83 L.Ed.2d 878 (1985) (municipality may not assert qualified immunity where its agent is sued in official capacity). The complaint contains claims for injunctive relief.[9] Thus, the court proceeds to consider whether the law would permit a recovery under the special relationship theory raised under the *DeShaney* analysis.

Since *DeShaney*, courts have struggled with whether state conduct short of actually taking a person into physical custody is sufficient to create a special relationship such that an affirmative duty is owed.[10] In *DeShaney*, the Supreme Court left open

---

**8.** The court has located only one case with similar facts. In *Piechowicz v. United States*, 885 F.2d 1207 (4th Cir.1989), the Fourth Circuit held that the United States and its agents were not liable for the murder, by a private person, of a witness because they had failed to extend protection to them. In so holding, the Fourth Circuit reasoned that the United States was not liable under *DeShaney* because the government had not taken the witnesses into custody. *Id.* at 1215. In that case, however, there was no offer of protective custody or relocation, much less a contractual obligation. *Id.* at 1215 n. 11.

**9.** The first count of the complaint, in pertinent part, states:

WHEREFORE, plaintiffs demand the following relief:

(a) a permanent injunction prohibiting defendants from denying plaintiffs the benefits of their contract with the state not limited to but including their agreed-to compensation and ordering payment to plaintiffs by defendants of money already due them.

Complaint ¶ 62.

**10.** In one of the earliest "special relationship" cases, the Seventh Circuit recognized the difficulties inherent in distinguishing what is and is not affirmative state action:

We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (per Posner, J.). *Accord White v. Rochford*, 592 F.2d 381, 384 (7th Cir.1982) ("it seems incongruous to suggest that liability should turn on the tenuous metaphysical construct which differentiates sins of omission and commission") (footnote omitted). *See* Comment, *The Supreme Court: 1988 Term*, 103 Harv.L.Rev. 40, 167–77 (1989) (criticizing rigid formalism of *DeShaney's* apparent action/inaction dichotomy).

the issue whether the state's placement of children in foster homes could impose an affirmative duty to protect under the due process clause. 109 S.Ct. at 1006 n. 9 (citing *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 141–42 (2d Cir.1981); *Taylor ex. rel. Walker v. Ledbetter*, 818 F.2d 791, 794–97 (11th Cir.1987) (en banc)). *See Stoneking v. Bradford Area School District*, 882 F.2d 720, 723–24 (3rd Cir.1988) (*Stoneking II*) (interpreting footnote 9 of *DeShaney* as permitting an affirmative duty to arise from state conduct short of actual custody); *Philadelphia Police and Fire Ass'n*, 874 F.2d at 167 n. 9 (noting that *DeShaney* leaves unresolved the foster care as custody question). Since *DeShaney*, at least one court has found such a duty may be owed to person not in physical custody. *Cornelius v. Town of Highland, Alabama*, 880 F.2d 348, 356–357 (11th Cir.1989) (reversing summary judgment for defendant officials whose conduct in bringing dangerous prisoner to town under auspices of work squad program affirmatively created danger that resulted in injury to plaintiff from prisoner). *Accord Pagano v. Pagano v. Massapequa Public Schools*, 714 F.Supp. 641 (E.D.N.Y.1989) (finding claim that school officials were liable for physical and verbal abuse by other students was sufficient to withstand motion to dismiss despite *DeShaney*). *Cf. Horton v. Flenory*, 889 F.2d 454 (3d Cir.1989) (finding that police officer's instructing burglary suspect to remain in private club where there was reason to believe suspect's safety was threatened by club owner who was interrogating him was sufficient to constitute custody); *Dudosh v. City of Allentown*, 722 F.Supp. 1233, 1235 (E.D.Pa.1989) (suggesting that complaint would not have been dismissed had the police affirmatively instructed decedent to stand before doorway through which assailant shot and killed her).

This court agrees with plaintiffs that an informant such as G–69 is in a "special relationship" with the state where, as here, both parties anticipate that the informant's activities, if discovered, could result in a threat to the life of the informant. It is difficult to imagine that a person would enlist for such a dangerous position absent some guarantee of personal safety. Having made such a guarantee, when there is so clear a risk to an individual's life and liberty, the state may not, consistent with the Constitution, walk away from the bargain. Plaintiffs have presented evidence sufficient for a finder of fact to conclude that the state induced G–69 to work as an undercover informant, and that the state promised G–69 protection and a new identity in the event that his identity was discovered, a promise upon which G–69 relied. *Cf. Jensen v. Conrad*, 747 F.2d 185, 194–95 n. 11 (4th Cir.1984) (noting that one factor to consider in evaluating whether special relationship exists is "[w]hether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals"). The nature of the relationship was such that as G–69 became more effective and as he conveyed increasingly sensitive information, so increased by a corresponding proportion the risk to his life in the event that he was discovered. To the extent that the state benefitted from the increase in the threat to plaintiffs, the state has affirmatively assumed a duty to plaintiff that it may not discard consistent with the dictates of due process.

### 4. *Retention of Jurisdiction Over Pendent Claims*

██ Defendants have also moved to dismiss all pendent claims against them for lack of jurisdiction. The court is free to exercise its discretion to maintain jurisdiction over the pendent claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726–29, 86 S.Ct. 1130, 1139–40, 16 L.Ed.2d 218 (1966). Critical to this court's exercise of its discretion is an evaluation of what issues will remain to be tried here. As the court held in its March 2, 1987 opinion, the complaint properly states a cause of action for prospective injunctive relief against individual officials in their official capacities. Unless they have left their positions with the State, defendants Brody and Goas are currently state officials whom plaintiffs may sue in their official capacities. The court is therefore free

to exercise pendent jurisdiction over plaintiffs' pendent claims against Brody and Goas.

Judicial economy likewise favors retaining jurisdiction over the pendent claims asserted against defendants Degnan, Kimmelman, and Belsole. Many of the same factual issues to be presented in the federal due process claims against Brody and Goas will be at issue in the state law claims against Degnan, Kimmelman, and Belsole. Retention of jurisdiction also reduces the possibility of inconsistent adjudications of the rights and liabilities of the parties. Moreover, defendants did not move for summary judgment on the basis of qualified immunity until this relatively late stage in the litigation, and they do not address the merits of the state law issues. The court will therefore retain jurisdiction over the pendent claims against all of the Attorney General defendants.

## CONCLUSION

For the foregoing reasons, the court concludes that defendants' motion for summary judgment will be granted in part and denied in part. The law was not so clearly established that defendants may be stripped of their qualified immunity under the standard enunciated in *Anderson v. Creighton*, 483 U.S. at 639–40, 107 S.Ct. at 3039. Accordingly, all claims under 42 U.S.C. § 1983 for money damages against the moving defendants will be dismissed with prejudice. The claims for prospective injunctive relief against defendants Brody and Goas, however, remain to be decided. The court has found that plaintiffs have shown a constitutional right was and continues to be violated, provided that they can convince a finder of fact of the truth of their factual claims. Likewise, the court elects to retain jurisdiction over the pendent claims against all defendants.

An appropriate order will be entered.